UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| YASMEEN MCEACHIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | SA-24-CV-1108-FB (HJB) |
| | § | |
| COMMUNICARE HEALTH FOUNDATION | § | |
| and BARRIO COMPREHENSIVE FAMILY | § | |
| HEALTH CARE CENTER, INC., | § | |
| | § | |
| Defendants. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns two dispositive motions filed by Defendants in this case: the First Amended Partial Motion to Dismiss for Failure to State a Claim (Docket Entry 6) filed by Defendant Barrio Comprehensive Family Health Care Center, Inc., d/b/a CommuniCare ("CommuniCare"); and the First Amended Motion to Dismiss for Failure to State a Claim (Docket Entry 7) filed by Defendant CommuniCare Health Foundation ("the Foundation"). Pretrial matters have been referred to the undersigned for consideration. (*See* Docket Entry 10.) For the reasons set out below, I recommend that the Foundation's motion (Docket Entry 7) be **GRANTED**, and that CommuniCare's motion (Docket Entry 6) be **GRANTED IN PART** and **DENIED IN PART**.

I.      **Jurisdiction.**

Plaintiff asserts claims for violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12102 *et seq.* ("ADA"), as amended, Pub. L. No. 110–325, 122 Stat. 3553, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Pregnant Workers' Fairness Act, 42 U.S.C. §§ 2000gg *et seq.* ("PWFA"), the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, and the

Family and Medical Leave Act,  29 U.S.C. §§ 2601 *et seq.* ("FMLA").  The Court has original jurisdiction over these claims pursuant to 28 U.S.C. § 1331.  The undersigned issues this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.    Applicable Legal Standard.

The Court must dismiss a complaint when it fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Dismissal "can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Sims v. Allstate Fire & Cas. Ins. Co.*, 746 F. Supp. 3d 417, 420 (W.D. Tex. 2024).  To survive dismissal, the complaint must allege "enough facts to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility when the well-pleaded facts allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"In determining whether to grant a motion to dismiss, the district court must not go outside the pleadings."  *Bob Davis Paint & Drywall Inc. v. Valspar Corp.*, 452 F. Supp. 3d 589, 596 (S.D. Tex. 2020) (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)).  The Court's inquiry "is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken."  *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted).  However, the Court may also consider documents attached to a motion to dismiss when they "are referenced in the complaint and are central to the plaintiff's claims."  *Id.*; *see Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) ("Documents . . . attache[d] to a motion to dismiss are . . . part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

2

In ruling on a 12(b)(6) motion to dismiss, "the Court assumes the truth of 'well-pleaded factual allegations' and 'reasonable inference[s]' therefrom." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 181 (2024) (quoting *Iqbal*, 556 U.S. at 678–79).  However, the Court does not assume the truth of "legal conclusions; mere labels; [t]hreadbare recitals of the elements of a cause of action; conclusory statements; [or] naked assertions devoid of further factual enhancement." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc) (quoting *Iqbal*, 556 U.S. at 678) (internal marks omitted); *see Damond v. City of Rayville*, 127 F.4th 935, 938 (5th Cir. 2025) ("[C]onclusory allegations or legal conclusions masquerading as fact[s] . . . will not suffice to prevent a motion to dismiss.").

## III.    Factual Background.[1]

On May 7, 2019, Plaintiff began working for CommuniCare at a medical clinic in San Antonio, Texas.  (Docket Entry 1, at 2–3; Docket Entry 6, at 3.)  She began as a medical assistant ("MA") in the OBGYN Department, and was promoted to supervisor of the department in May of 2022.  (*Id.* at 3.)  A month later, Plaintiff learned that she was pregnant and informed her supervisors of the discovery.  (*Id.*)  Her pregnancy was complicated by the fact that she suffered from hypertension and anemia.  (*Id.*)  As her pregnancy progressed, Plaintiff was diagnosed with hyperemesis gravidarum, which causes severe and persistent nausea and vomiting.  (*Id.*)  As a result of her condition, Plaintiff was routinely vomiting six or more times before 7:00 A.M., and had difficulty eating and digesting her food.  (*Id.*)

Due to complications with her pregnancy, Plaintiff was on medical leave from July 2022 to November 2022.  (Docket Entry 1, at 3.)  After returning to work, Plaintiff was hospitalized

---

[1] The Court assumes the truth of the allegations in Plaintiff's complaint at this stage in the proceedings. *Iqbal*, 556 U.S. at 678–79.

twice due to further complications with her pregnancy: once in November and again in December of 2022. (*Id.*) In December of 2022, Plaintiff's job title was changed from Supervisor to "MA Team Lead," and she was told to vacate her office and set up at the nurses' station, where she had no desk and was only given a backless stool to sit on. (*Id.* at 3–4.) Plaintiff told her supervisors that she needed a chair with back support, but she was ignored. (*Id.* at 4.) She only received a real chair when another MA generously traded with her. (*Id.*)

Plaintiff went on maternity leave on February 6, 2023, and delivered her daughter two days later. (Docket Entry 1, at 4.) On March 9, 2023, Plaintiff's doctor cleared her to return to work. (*Id.*) When Plaintiff shared the news with her supervisor, she was advised that she was being transferred to a different location. (*Id.*) On March 23, 2023, Plaintiff arrived at the new location and discovered that it did not have an OBGYN department. (*Id.*) Instead, Plaintiff was sent to work in the clinic's "Family Department." (*Id.*) On May 22, 2023, after taking a month off to take care of her daughter, Plaintiff asked her new manager, Ashley, if she could be transferred to a clinic with an OBGYN department. (*Id.* at 4–5.)

On June 20, 2023, the manager from another clinic, Rachel, reached out and invited Plaintiff to transfer to her location. (Docket Entry 1, at 5.) The next day, Ashley told Plaintiff that she would be transferred to Rachel's clinic on July 3, 2023. (*Id.*) Before the move, Plaintiff had a phone conversation with Rachel about her daughter's medical needs and appointments, including a surgery for an umbilical hernia. (*Id.*) Rachel assured Plaintiff that this was all fine. (*Id.*) When Plaintiff arrived at her new location, she discovered that Rachel would not be her manager. (*Id.*) But the new manager, Shannon, assured Plaintiff that she was aware of her medical and parental needs. (*Id.*) Shannon advised Plaintiff that she could come in late and leave early to make time for any medical appointments. (*Id.*)

On July 14, 2023, Plaintiff told Krystal, the MA Team Lead, that she needed time off on July 31, 2023, for her daughter's surgery. (Docket Entry 1, at 6.)  Krystal told her to go ahead and mark that she would be out that day on the shared staff calendar. (*Id.*)  As that date grew closer, Plaintiff reminded Krystal, and told Shannon, that she needed to be out for her daughter's surgery. (*Id.*)  On July 28, 2023, Plaintiff sent a group message to Krystal and the other staff stating that she would be out on the 31st. (*Id.*)  Krystal called Plaintiff later that day, expressing confusion at her request for time off—stating that she did not remember discussing the request with Plaintiff before then—but ultimately agreed to it. (*Id.*)

On August 3, 2023, Plaintiff emailed Krystal and Shannon to request permission to either work remotely from home or work part time. (Docket Entry 1, at 6.)[2]  That afternoon, Krystal called Plaintiff into her office, where Shannon was also waiting. (*Id.*)  Krystal said that she did not remember Plaintiff's previously requesting time off and reprimanded her for ignoring a phone call. (*Id.*)  Krystal and Shannon told Plaintiff that she had officially received a "verbal warning" for her conduct. (*Id.*)  The next day, Shannon assured Plaintiff that she was not in trouble, but that Plaintiff had to remind her the next time she needed time off. (*Id.*)  Shannon also told Plaintiff that approval of non-FMLA leave requests was ultimately up to "[D]irector Myrna." (*Id.*)  Shannon also informed Plaintiff that she had already forwarded Plaintiff's non-FMLA leave request to Director Myrna. (*Id.* at 7.)

On August 22, 2023, Plaintiff asked Krystal whether she had heard anything about the status of Plaintiff's request for non-FMLA leave. (Docket Entry 1, at 7.)  Krystal had not, but she told Plaintiff she would text Director Myrna for an update. (*Id.*)  Plaintiff also sent her own

---

[2] While it is unclear from the complaint, Plaintiff's EEOC charge would suggest the request was related to another surgery for her daughter, which was scheduled for August 29, 2023. (Docket Entry 6-2; Docket Entry 7-2.)

message to Director Myrna for an update. (*Id.*) Later that day, Krystal and Shannon told Plaintiff that her employment was being terminated because of complaints that she was "taking excessive breaks" on August 18, 2023, and that, on August 21, 2023, she was "putting on makeup" and "laying [sic] down in a patient room" when she should have been working. (*Id.*) This was the first time any complaints about Plaintiff's work performance had ever been mentioned to her. (*Id.*) In fact, at an employee meeting on August 9, 2023, Krystal and Shannon specifically told her that she was doing well and that they had no issues with her work performance or anything else. (*Id.*)

Plaintiff filed suit on October 1, 2024, claiming that Defendants demoted, disciplined, transferred, and ultimately fired her because of her disabilities, her daughter's disabilities, and her requests for and uses of workplace and scheduling accommodations to treat and manage those disabilities. (*Id.* at 7–12.) Plaintiff's complaint asserts claims under Title VII, the ADA, the Rehabilitation Act, the PWFA, and the FMLA. (*Id.*) Both CommuniCare and the Foundation have moved to dismiss for failure to state a claim. (Docket Entries 6 and 7.) Both motions include a copy of Plaintiff's EEOC Charge of Discrimination as attachments.[3] (Docket Entries 6-2 and 7-

---

[3] The undersigned briefly notes that both Defendants request that their motions to dismiss be converted into motions for summary judgment to the extent that doing so is a prerequisite to the Court's considering the attached EEOC documents. (Docket Entry 6, at 5 n. 4; Docket Entry 7, at 5 n. 7.) It does not appear that conversion is necessary. *See, e.g.*, *Lopez v. AT&T Mobility Servs. LLC*, 767 F. Supp. 3d 406, 420 (W.D. Tex. 2025) ("[E]ven at the 12(b)(6) stage, courts may take judicial notice of . . . . the filing and contents of relevant EEOC documents."); *Prewitt v. Cont'l Auto.*, 927 F. Supp. 2d 435, 447 (W.D. Tex. 2013) ("[A] court may take judicial notice of EEOC documents as a matter of public record when deciding a Rule 12(b)(6) motion."). It is also inappropriate, as the motions were filed a mere two months after Plaintiff filed her complaint. *See, e.g.*, *Coleman v. Anco Insulations, Inc.*, 196 F. Supp. 3d 608, 611–12 (M.D. La. 2016) (denying as premature motion for summary judgment filed "prior to the commencement of formal discovery"); *Barnett v. Stafford Transp. of La.*, No. 1:20-CV-280, 2021 WL 2778281, at *2–3 (E.D. Tex. Mar. 12, 2021) (denying as premature motion for summary judgment filed seventeen weeks before the close of discovery); *Phongsavane v. Potter*, No. SA-05-CV-219-XR, 2005 WL 1514091, at *5 (W.D. Tex. June 24, 2005) (denying as premature motion for summary judgment filed before any answer had been filed or scheduling order entered).

2.)  Plaintiff has responded to the motions (Docket Entries 12 and 13), and Defendants have replied (Docket Entries 14 and 15.)

**IV.    Discussion.**

Defendants' motions include numerous arguments, some of which are raised in both motions and some of which are individual to each Defendant.  (*See* Docket Entry 7, at 6–16; Docket Entry 6, at 5–13.)  This Report and Recommendation first addresses Defendants' common and overlapping arguments before turning to their remaining individual arguments.

**A. *Defendants' Common and Overlapping Arguments.***

Defendants' motions raise the following common and overlapping arguments: (1) that Plaintiff cannot assert a PWFA claim because the statute's passage violated the quorum clause of the United States Constitution, rendering it invalid; (2) that Plaintiff's Rehabilitation Act claim fails because she pleaded it conditionally; (3) that Plaintiff cannot assert an ADA claim for associational discrimination based on her use of leave to care for her disabled daughter; and (4) that Plaintiff failed to exhaust administrative remedies concerning her own disability.  Each of these arguments is addressed in turn below.

1.  *Whether Passage of the PWFA Violated the Quorum Clause.*

Defendants argue that Plaintiff's PWFA claims fail because the statute's passage violated the Quorum Clause of the United States Constitution.  (Docket Entry 6, at 12–14; Docket Entry 7, at 15–16.)  A review of the history of the Clause and legislative practice, and Judge Hendrix's opinion in *Texas v. Garland*, 719 F. Supp. 3d 521 (N.D. Tex. 2024), *appeal pending*, No. 24-10386 (5th Cir. May 1, 2024)—the only published decision to address the question—all support Defendants' argument.

The Quorum Clause provides that:

> Each House shall be the Judge of the Elections, Returns[,] and Qualifications of its own Members, *and a Majority of each shall constitute a Quorum to do Business*; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

U.S. CONST. art. I, § 5, cl. 1 (emphasis added).  Based on the prevailing definition of "quorum" at the time of the Constitution's ratification, "a majority [w]as the necessary number of members for either house of congress to do business." *Garland*, 719 F. Supp. 3d at 584 (citing six founding-era dictionaries).[4]  It is therefore unsurprising that less than a quorum of either house is empowered "to compel the Attendance of absent Members," U.S. CONST. art. I, § 5, cl. 1—a power which would be wholly unnecessary if anything less than a majority of physically-present members were sufficient for the house to conduct its business.  *See Garland*, 719 F. Supp. 3d at 584 ("It would belie logic for the Constitution to give the House the ability '[t]o force' or 'oblige' members who are '[n]ot present' to attend—right after noting the number necessary to do business—if physical presence were unnecessary for a member to count as part of the quorum.") (quoting 1 Samuel Johnson, *A Dictionary of English Language* (6th ed. 1785)).  Thus, the Quorum Clause requires the physical presence of a majority of the members of each house of Congress before that house may take any official action—such as voting on legislation.  *See* JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 832 (1833) ("The constitution of the United

---

[4] It is also telling that "the members of the first Congress believed that the Quorum Clause required each house to have the physical presence of a majority before it could take any action." *Garland*, 719 F. Supp. 3d at 588–89 (citing 1 Annals of Cong. 15–16, 95–96 (1789) (Joseph Gales ed., 1834)). Indeed, "[b]oth chambers waited nearly a month for enough members to arrive," after sending letters to absent members "requesting their immediate attendance. . . . in order to form a quorum." *Garland*, 719 F. Supp. 3d at 589 (quoting 1 Annals of Cong. 15–16 (1789) (Joseph Gales ed., 1834)). In a March 18, 1789, letter to absent senators, the Senate specifically wrote that "the 'presence' of a majority of members was 'indispensably necessary.'" *Garland*, 719 F. Supp. 3d at 589 (quoting S. Journal, 1st Cong., 1st Sess. 5–6 (1789)).

States, . . . by requiring a majority for a quorum, has secured the public from any hazard of passing laws by surprise, or against the deliberate opinion of a majority of the representative body.").

Notwithstanding the Quorum Clause's requirement of a physically present majority of house members, "[t]he practice of unanimous consent is widespread in Congress and is used to pass legislation despite the lack of a physical quorum." *Garland*, 719 F. Supp. 3d at 591. The practice "permits measures to be passed in the absence of a physical quorum due to a *presumption* of a quorum." *Id.* (citing 5 Lewis Deschler, *Deschler's Precedents of the U.S. House of Representatives*, Ch. 20 § 1 (1994)) (emphasis added). Specifically, "[o]nce a quorum is obtained through a majority's physical presence at the beginning of each Congress, the House presumes that a quorum is always present 'unless disclosed by a vote or questioned by a point of no quorum.'" *Garland*, 719 F. Supp. 3d at 591 (quoting 5 Deschler, *supra*, at Ch. 20 §§ 1, 2.1). The Supreme Court has addressed the use of unanimous consent "without casting constitutional doubt on the practice." *Garland*, 719 F. Supp. 3d at 592 (citing *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 549–56 (2014) (holding that *pro forma* Senate sessions were not periods of recess for purpose of President's recess-appointment power because present minority could conduct business by unanimous consent)).

When the House of Representatives is operating under a presumption of a quorum based on unanimous consent, "no counting of votes occurs" unless one of the present members "objects or . . . raises the lack of a quorum." *Garland*, 719 F. Supp. 3d at 592. Doing so triggers a roll-call vote, which "itself can demonstrate that a quorum [i]s not physically present." *Id.*; *see* H.R. RULE XX, cl. 6(a), 117th Cong. (2021) ("When a quorum fails to vote on a question, a quorum is not present."). "And once a vote reveals that a quorum is lacking, the House . . . must either obtain a quorum or adjourn—they cannot ignore the demonstrated absence by unanimous consent."

*Garland*, 719 F. Supp. 3d at 592–93 (citing 5 Deschler, *supra*, at Ch. 20 §§ 10.4, 10.5, 10.6, and 6 Clarence Cannon, *Cannon's Precedents of the House of Representatives of the U.S.*, Ch. 208 § 660 (1935)).  In short, while the houses of Congress "can presume that a quorum exists to conduct business under procedures that would not demonstrate the lack of a quorum," they cannot "affirmatively count[] . . . absent member[s] as present even though a roll-call vote shows the lack of a quorum."  *Garland*, 719 F. Supp. 3d at 593; *see* Cong. Globe, 42d Cong., 2d Sess. 3857 (1872) ("The vote upon the passage of th[e] bill by yeas and nays has disclosed the fact that there is not a quorum in the House[;] [t]he House thereby becomes constitutionally disqualified to do further business, except . . . to adjourn, or to order a call of the House."); *see also Noel Canning*, 573 U.S. at 554 ("If any present Senator had raised a question as to the presence of a quorum, and by roll call it had become clear that a quorum was missing, the Senators in attendance could have directed the Sergeant at Arms to bring in the missing Senators.").

With respect to the PWFA, "[l]ess than a majority of the members of the House voted in person on the Act."  *Garland*, 719 F. Supp. 3d at 594 (citing 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022)).  "Only 205 votes . . . were cast in person," while "226 of the votes were cast by proxy."  *Garland*, 719 F. Supp. at 594 (citing 168 Cong. Rec. H10528–29).  Representative Chip Roy objected to the lack of a quorum, but was told by the Speaker Pro Tempore that "Members casting their vote or recording their presence by proxy [we]re counted for the purpose of establishing a quorum."  *Garland*, 719 F. Supp. 3d at 540–41 (quoting 168 Cong. Rec. H10529). The basis for counting absent members as present for purposes of a quorum was House Resolution 965, passed on May 15, 2020,[5] which purported to permit "[a]ny Member whose vote [was] cast

---

[5] House Resolution 965 was passed in the wake of the COVID-19 pandemic. *See CDC Museum COVID-19 Timeline*, Centers for Disease Control and Prevention (Jul. 8, 2024), available at . Prior to this resolution, the House had historically abided by the quorum clause's requirements

or whose presence [was] recorded by a designated proxy . . . . [to] be counted for the purpose of establishing a quorum." *Garland*, 719 F. Supp. 3d at 539 (quoting H.R. Res. 965, 116th Cong. § 3(b) (2020)). But "[t]reating absent members as present via proxy in order to create a non-present majority violates the Quorum Clause." *Garland*, 719 F. Supp. 3d at 594. Once Representative Roy objected to the lack of a quorum, the House was left with only "two options: adjourn or compel the attendance of [the] absent members." *Id.* There was no third option to circumvent the quorum requirement by construing absent members as physically present. Thus, "the House lacked the constitutionally required quorum" when it purported to pass the PWFA. *Id.*

Because the enactment of the PWFA violated the Quorum Clause, Plaintiff's PWFA claims should be dismissed.

### 2. *Plaintiff's Conditionally-Pleaded Rehabilitation Act Claim.*

"Section 504 of the Rehabilitation Act prohibits 'any program or activity receiving Federal financial assistance' from discriminating against disabled individuals." *Shaikh v. Tex. A&M Univ. Coll. of Med.*, 739 F. App'x. 215, 218 (5th Cir. 2018) (quoting 29 U.S.C. § 794(a)). Both Defendants argue that Plaintiff's Rehabilitation Act claim should be dismissed because her complaint contains no factual allegations plausibly showing that either of them receives federal financial assistance. (Docket Entry 6, at 11–12; Docket Entry 7, at 14–15.) Defendants are correct.

"[T]o state a § 504 claim under the Rehabilitation Act, a plaintiff must allege that the specific program or activity with which he or she was involved receives or directly benefits from federal financial assistance." *Taylor v. City of Shreveport*, 798 F.3d 276, 283 (5th Cir. 2015)

---

notwithstanding the difficulties and dangers presented by public health crises. *See, e.g.*, *Garland*, 719 F. Supp. 3d at 590 ("During the 1918 flu epidemic, the House repeatedly failed to obtain a quorum as few members attended legislative sessions.") (citing *Whereas: Stories from the People's House–Sick Days*, U.S. House of Representatives, Hist., Art & Archives (Dec. 17, 2018)).

(internal marks omitted).  But rather than alleging that either Defendant specifically receives or benefits from federal funds, Plaintiff merely alleges that "[t]o the extent Defendants receive any federal funds, Plaintiff asserts a claim under the Rehabilitation Act for discrimination."  (Docket Entry 1, at 10.)  This does not suffice.  "To survive a Rule 12(b)(6) motion to dismiss, the complaint . . . must provide . . . factual allegations that, when assumed to be true, raise a right to relief above the speculative level."  *Taylor*, 798 F.3d at 279.  A conditional allegation is quintessentially speculative and cannot suffice to nudge a claim "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 683.  Accordingly, Plaintiff's Rehabilitation Act claims should be dismissed without prejudice, and she should be given the opportunity to amend her complaint to plausibly—not conditionally—allege receipt by Defendants[6] of the financial assistance necessary to assert a claim under the Rehabilitation Act.

### 3.  *Plaintiff's Associational Discrimination Claim.*

The ADA prohibits employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  For instance, an employer cannot refuse to hire a qualified individual with a disabled family member based on the "belie[f] that [the employee] would have to miss work or frequently leave work early in order to care for the[m]."  29 C.F.R. Pt. 1630, App'x. § 1630.8 (2024); *see Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 760 (5th Cir. 1996); *Spinks v. Trugreen Landcare, L.L.C.*, 322 F. Supp.

---

[6] While the undersigned recommends below that the Court grant the Foundation's motion (Docket Entry 7) in part on the grounds that Plaintiff has failed to plausibly allege that it was her employer, *see* Part IV(b)(1), *infra*, this would not necessarily bar her Rehabilitation Act claim against the Foundation, because "the Rehabilitation Act is not limited to the employment context." *Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422, 427 (5th Cir. 2016). Thus, if Plaintiff can amend her complaint to plausibly allege that the Foundation is a recipient of federal funds, she may be able to proceed against both Defendants on her Rehabilitation Act claim.

2d 784, 795 (S.D. Tex. 2004). However, an employer's duty to provide reasonable accommodations extends only to employees who are themselves disabled—"for example, an employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for a spouse with a disability." 29 C.F.R. Pt. 1630, App'x. § 1630.8.

In her complaint, Plaintiff alleges that her daughter had a known disability as a result of a premature birth and other medical conditions, such that she needed "to request time off to take her . . . [to] extensive treatment[s]." (Docket Entry 1, at 8.) She further alleges that Defendants told her she would be allowed to "come in late and leave early for some appointments." (*Id.* at 5.) But when Plaintiff sought time off to take her daughter to surgery—and reminded Defendants about it multiple times—Defendants eventually approved the request but then disciplined her with a "verbal warning" for taking time off from work without asking for permission to do so first. (*Id.* at 5–6.) Ultimately, Plaintiff claims that Defendants violated the ADA by "fail[ing] to accommodate [her daughter's] disabilities," and by firing Plaintiff for "absences that had been approved." (*Id.* at 8.)

Plaintiff's complaint fails to plausibly allege an associational discrimination claim under the ADA. "The ADA does not require employers to accommodate a non-disabled worker who chooses to take leave from work in order to care for a disabled relative." *Balachandran v. Valvtechnologies, Inc.*, No. 4:20-CV-1078, 2021 WL 3639806, at *2 (S.D. Tex. July 30, 2021). Thus, Defendants could not have violated the ADA by refusing to "restrict[] [Plaintiff's] work schedule or allow[] [her] to miss work," to take care of her daughter's medical needs. *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 887 (5th Cir. 2020). And "[e]ven accepting as true that [Plaintiff] was fired for [her] use of leave, . . . such actions are not prohibited *under the ADA*." *Id.* Accordingly, Plaintiff's ADA claim for associational discrimination should be dismissed.

4.  *Administrative Exhaustion for ADA Claims Based on Plaintiff's Own Disability.*

Defendants argue that Plaintiff's ADA and PWFA claims based on her own alleged disabilities should be dismissed because she failed to timely exhaust administrative remedies for those claims.    (Docket Entry 6, at 5–9; Docket Entry 7, at 8–12.)    As this Report and Recommendation suggests dismissal of the PWFA claim on other grounds, only exhaustion of the ADA claim is considered below.

"Employment discrimination plaintiffs must exhaust administrative remedies before pursuing claims in federal court." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002).  The procedures for exhausting ADA claims are identical to those for Title VII claims. *Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996).  As such, "a plaintiff must file a claim with the EEOC within 180 days of the unlawful act. . . ." *Williamson v. Am. Nat. Ins. Co.*, 695 F. Supp. 2d 431, 445 (S.D. Tex. 2010) (citing *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 549 (5th Cir. 2009)).  "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of [her] right to sue." *Taylor*, 296 F.3d at 379.  A plaintiff then "ha[s] [90] days to file a civil action after *receipt* of such a notice from the EEOC." *Id.*  A plaintiff is presumed to have received her right-to-sue letter from the EEOC within three days of the mailing date on the letter. *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 411 (5th Cir. 2003); *see also Jenkins v. City of San Antonio Fire Dept.*, 12 F. Supp. 3d 925, at 934–39 (W.D. Tex. 2014) (collecting cases).

Any post-exhaustion lawsuit is "limited in scope to the scope of the plaintiff's administrative charge and to the EEOC investigation that can reasonably be expected to grow out of the charge of discrimination." *Williamson*, 695 F. Supp. 2d at 445 (citing *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006)).  To determine whether a claim has been exhausted, the Court

must "engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Pacheco*, 448 F.3d at 789.

> Here, Plaintiff's EEOC charge, in full, states:

> I believe I suffered discrimination, harassment, and retaliation due to [1] my sex (female), [2] my pregnancy[,] and [3] [my] request[s] for leave related to medical conditions [of] my newborn baby in violation of Title VII . . . the [ADA] . . . the Texas Labor Code[,] and the [PWFA]. I was hired on May 7, 2019 and worked at the same location until I went on maternity leave on Feb. 6, 2023. My baby was born premature on Feb. 8, 2023. While out on maternity leave, I was transferred to a different location. I was told it was because it was closer to my home. I would request time off for medical visits for my baby. I was transferred again in July 2023. This time no reason was given. My baby developed a hernia and I told my employer surgery was scheduled for August 29, 2023. On August 23, 2023, I was wrongfully terminated.

(Docket Entry 6-2; Docket Entry 7-2; Docket Entry 12-7; Docket Entry 13-1.)

Defendants argue that Plaintiff failed to exhaust any ADA claim based on her own disabilities, if any, because the statement she provided in her EEOC charge refers only to her "newborn baby['s] . . . medical conditions," "medical visits for [her] baby," and the fact that "[her] baby developed a hernia" which required surgery. (Docket Entry 6, at 8; Docket Entry 7, at 10–11.) There is no mention in Plaintiff's EEOC charge that she herself suffered from any disability. While Plaintiff's EEOC charge does explain that she was pregnant, discrimination based on pregnancy is prohibited by Title VII's prohibition against discrimination on the basis of sex—not the ADA's prohibition of discrimination on the basis of disability. *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 684 (1983) ("[D]iscrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."); *Folkes v. Univ. of Houston*, No. CV H-20-3165, 2021 WL 4820675, at *3 (S.D. Tex. Oct. 15, 2021) ("[P]regnancy discrimination is a sex-based discrimination claim and is not considered a disability under the ADA.").

As no ADA claim based on Plaintiff's disability is mentioned in the charge, the Court must determine whether such an ADA claim plausibly grew out of the EEOC's investigation.  In support of her claim, Plaintiff has produced notes taken by the EEOC investigator.  (Docket Entry 12-10; Docket Entry 13-3.)[7]  The notes indicate that Plaintiff told Defendants that she suffered from "[h]ypertension, [a]nemia, [h]yperemesis gravidarum, [s]uperimposed preeclampsia, migraines[,] and palpitations."  (Docket Entry 12-10, at 3; Docket Entry 13-3, at 3.)  However, nowhere in the notes does it indicate that Plaintiff complained that she was denied an accommodation, was discriminated against, or was retaliated against on the basis of these medical conditions.  To the contrary, the only condition of Plaintiff's that the EEOC investigator included in his summary of the charge was that Plaintiff "was discharged and retaliated against due to her *pregnancy* (PFWA, Title VII, ADA)."  (Docket Entry 12-10, at 1 (emphasis added); Docket Entry 13-3, at 1 (emphasis added).)  And as the undersigned previously mentioned, pregnancy is a predicate for "a sex-based discrimination claim and is not considered a disability under the ADA."  *Folkes*, 2021 WL 4820675, at *3.  Thus, even considering the EEOC investigator's notes, an investigation of an ADA claim based on Plaintiff's own alleged disabilities did not "grow out of the charge of discrimination."  *Williamson*, 695 F. Supp. 2d at 445.

Alternatively, even if Plaintiff's pregnancy were treated as a disability for purposes of an ADA claim, her claim would fail.  The EEOC notes indicate that Plaintiff requested an accommodation in the form of a chair with back support "around December 2022 or January 2023."  (Docket Entry 12-10, at 3; Docket Entry 13-3, at 3.)  According to the notes—as well as

---

[7] Defendants object to Plaintiff's use of the EEOC documents in responding to their motions. (Docket Entries 14, at 3–4; Docket Entry 15, at 6–8.) However, "a court may take judicial notice of EEOC documents as a matter of public record when deciding a Rule 12(b)(6) motion." *Prewitt v. Cont'l Auto.*, 927 F. Supp. 2d 435, 447 (W.D. Tex. 2013) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

the complaint—Plaintiff's request was ignored. (Docket Entry 1, at 4; Docket Entry 12-10, at 3; Docket Entry 13-3, at 3.) The complaint also indicates, however, that Plaintiff's need for the accommodation was mooted when a coworker traded chairs with her. (Docket Entry 1, at 4.) This occurred before February 6, 2023—when Plaintiff went on maternity leave. (*Id.* at 4.) Liberally construing Plaintiff's EEOC charge, related documents, and her complaint, the latest that the denial of her request could have occurred, then, was February 6, 2023. Plaintiff therefore had 180 days from February 6, 2023—*i.e.*, August 5, 2023—to file an EEOC charge based on the failure to provide that accommodation. *See Williamson*, 695 F. Supp. 2d at 445 ("[A] plaintiff must file a claim with the EEOC within 180 days of the unlawful act."). Plaintiff filed her EEOC charge, on September 23, 2023. (Docket Entry 6-2; Docket Entry 7-2; Docket Entry 12-7; Docket Entry 13-1.) Thus, even if a denied pregnancy accommodation was considered the basis of an ADA claim based on Plaintiff's own disability, that claim was not timely exhausted.

For all the above reasons, the Court should dismiss Plaintiff's ADA claims based on her own disability.

### B. Defendant's Separately-Asserted Arguments.

The undersigned now turns to the remaining grounds for dismissal which are separately asserted by the Defendants: (a) whether the Foundation was Plaintiff's employer; and (b) whether Plaintiff has sufficiently pleaded an FMLA claim specifically against CommuniCare as her employer. Both arguments are addressed in turn below.

#### 1. *The Foundation.*

"[B]ecause she sues under statutes applicable to 'employers,' [Plaintiff] must show the Defendants were her employer to state a claim for relief." *Dunlap v. Fort Worth Indep. Sch. Dist.*, No. 4:21-CV-00790-O-BP, 2021 WL 6503710, at *5 (N.D. Tex. Dec. 15, 2021), *report and*

*recommendation adopted*, No. 4:21-CV-00790-O-BP, 2022 WL 160242 (Jan. 18, 2022). The Court uses a "hybrid economic realities/common law control test" to determine the existence of an employer-employee relationship. *Perry v. VHS San Antonio, L.L.C.*, 990 F.3d 918, 928–29 (5th Cir. 2021). Under this test, "[t]he right to control the employee's conduct" is the most important consideration and turns on "the right to hire and fire, the right to supervise, and the right to set the employee's work schedule." *Id*. at 929. The economic realities component "focuses on who paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Id*.

The Foundation seeks dismissal on the basis that it was not Plaintiff's "employer." (Docket Entry 7, at 7.) In her response to the Foundation's motion, Plaintiff argues that "whether a defendant is an employer is a fact question that is 'not appropriate for adjudication on a motion to dismiss.'" (Docket Entry 12, at 2–3 (quoting *Quest v. Bandera Cnty.*, No. 5:13-CV-00506-DAE, 2013 WL 6835147, at *5 (W.D. Tex. Dec. 26, 2013).) Even though the issue is one of fact, however, Plaintiff must plausibly alleged sufficient facts to avoid dismissal. She has not done so. In her complaint, Plaintiff alleges only that Defendants "jointly employed [her]," and that they both "operate clinics in San Antonio, Texas where Plaintiff worked." (Docket Entry 1, at 3.) The complaint is otherwise devoid of any factual allegations that the Foundation was Plaintiff's employer. Plaintiff has not alleged that the Foundation hired, fired, or supervised her, set her work schedule, paid her, withheld her taxes, provided her benefits, or set the terms and conditions of her employment. Absent any such allegations, Plaintiff's claim that the Foundation was her employer

is entirely conclusory, and insufficient.  Accordingly, her claims against the Foundation should be dismissed.[8]

        2. *CommuniCare.*

CommuniCare argues that Plaintiff's FMLA claim against it should be dismissed because, "[b]ased on [her] own pleadings, only one of the named Defendants violated the FMLA, but Plaintiff fails to allege which [one]."  (Docket Entry 6, at 10.)  Indeed, Plaintiff's amended complaint only uses the singular "Defendant" when addressing her FMLA claim.  (*See* Docket Entry 1, at 11–12.)  As to this ground, CommuniCare's motion fails.  Viewing the complaint in the light most favorable to Plaintiff, the Court should treat the singular "Defendant" as applying to either Defendant.  And any deficiency in this regard should not inure to the benefit of CommuniCare, which has affirmatively stated in its own motion that it was Plaintiff's employer, conceding that it hired Plaintiff as a medical assistant on May 7, 2019.  (Docket Entry 6, at 3.)

Relatedly, CommuniCare appears to argue that Plaintiff's FMLA claim should be dismissed because she "fails to allege any facts that support her bare bones assertion that CommuniCare was her joint employer."  (Docket Entry 6, at 10.)  But the FMLA is not limited to cases involving *joint* employers.  An employer for purposes of the FMLA is "any person engaged in commerce or in any industry affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks."  29 U.S.C. § 2611(4)(A)  CommuniCare's own website—to which it directs the Court in its motion— reveals that it operates more than 25 full

---

[8] The Foundation also argues that Plaintiff failed to exhaust her administrative remedies against it by failing to name it in her EEOC charge. (Docket Entry 7, at 9–10.) Because Plaintiff's claims against the Foundation should be dismissed on the other grounds, this Report and Recommendation does not address this exhaustion argument.

service medical clinics throughout the state of Texas.  (*See* Docket Entry 6, at 2 n.2.)[9]  Thus, viewed

in the light most favorable to Plaintiff, her complaint plausibly alleges that CommuniCare was her

employer for purposes of stating an FMLA claim.  CommuniCare's motion should be denied in

that respect.

## V.    Conclusion and Recommendation.

Based on the foregoing, I recommend that the Foundation's First Amended Motion to

Dismiss for Failure to State a Claim (Docket Entry 7) be **GRANTED**, and that CommuniCare's

First Amended Partial Motion to Dismiss for Failure to State a Claim (Docket Entry 6) be

**GRANTED IN PART** and **DENIED IN PART**.  Specifically, I recommend that the Court dismiss

all of Plaintiff's claims except for her Title VII and FMLA claims against CommuniCare.  Further,

I recommend that the Court's dismissal of Plaintiff's Rehabilitation Act claims against both

Defendants be **WITHOUT PREJUDICE** to Plaintiff's having an opportunity to amend her

complaint for the limited purpose of pleading additional facts, if any, to plausibly show that

Defendants are recipients of federal funds.

## VI.    Notice of Right to Object.

The Clerk of the Court shall serve a copy of this Report and Recommendation on all parties

by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing

user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail,

return receipt requested.  Written objections to this Report and Recommendation must be filed

---

[9] *See, e.g.,* https://communicaresa.org/healthcare-services/ (showcasing suite of services Barrio provides at its medical clinics) (last visited June 20, 2025); https://communicaresa.org/locations/ (listing the locations of more than 25 medical clinics Barrio operates throughout Texas) (last visited June 20, 2025).

**within 14 days** after being served with a copy of the same, unless this time period is modified by the District Court.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties.  An objecting party must specifically identify the findings, conclusions, or recommendations to which objections are being made and the basis for such objections; "objections that are frivolous, conclusory, or general in nature needn't be considered."  *Williams v. Lakeview Loan Serv. LLC*, 694 F. Supp. 3d 874, 881 (S.D. Tex. 2023) (citing *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo* review by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED** on July 3, 2025.

Henry J. Bemporad
United States Magistrate Judge